USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED:__5/20/2021__

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------------X
                    :

47 EAST 34TH STREET (NY), L.P.,          :

             Plaintiff,      :

                    :       20-cv-9978 (LJL)

      -v-                :

                    :    OPINION AND ORDER

BRIDGESTREET WORLDWIDE, INC., et al.,  :

                    :

           Defendants.     :

                    :
-------------------------------------------------------------------X

LEWIS J. LIMAN, United States District Judge:

      This action was commenced on June 19, 2018, by the filing of a summons in New York

Supreme Court by Plaintiff 47 E. 34th Street (NY), L.P. ("47 E. 34th St." or "Plaintiff"). It was

removed to this Court, pursuant to 28 U.S.C. § 1452(a) and 28 U.S.C. § 1334 on November 25,

2020 by the only remaining Defendants in the action, Domus BWW Funding, LLC ("Domus

Funding") and Versa Capital management, LLC ("Versa") (together, "Defendants"). Before the

Court is Plaintiff's motion to remand the action to state court. Dkt. No. 18. For the following

reasons, the motion is granted.

## BACKGROUND

      As discussed herein, the parties dispute precisely whence this action arises and to what it

relates. It is undisputed that the parties' relationship traces back, ultimately, to a 2012 lease (the

"Lease") between Plaintiff and non-party debtor BridgeStreet Corporate Housing, LLC

("BridgeStreet Corporate Housing"). *See* Dkt. No. 20-1. The Lease was guaranteed by

BridgeStreet Corporate Housing's then parent company, BridgeStreet Worldwide, Inc.

("BWW"). *See* Dkt. No. 1 ("Notice of Removal") ¶ 7; Dkt. No. 20-7 ("FAC") ¶¶ 26-34; Dkt.

No. 20-4 at 13-18 ("Guaranty"). In particular, BWW "unconditionally and irrevocably . . .

guarantee[d] that all sums stated in the Lease to be payable by [BridgeStreet Corporate Housing] . . . will be promptly paid in full when due," including costs "arising out of any failure by [BridgeStreet Corporate Housing] to pay or perform any of its obligations under the Lease." Guaranty ¶ 1.  The obligations established by the Guaranty Agreement could not be "waived, released, discharged or impaired" by reason of, among other things, "(i) any failure, omission or delay on the part of 47 [E. 34th St.] in exercising its rights under the Lease or the Guaranty, (ii) the dissolution, sale of all or substantially all of the assets, assignment for the benefit of creditors, reorganization, merger, arrangement, winding up or other similar proceeding affecting the Guarantor or any of its assets; and/or (iii) the expiration of the Term of the Lease."  FAC ¶ 28; *see* Guaranty ¶ 2.  The Guaranty further states that it is "a continuing guaranty of payment of performance, and not of collection," "[t]he liabilities and obligations of [BWW] . . . are primary and enforceable either before, simultaneously or after proceeding against [BridgeStreet Corporate Housing]," and that the Guaranty is binding on the successors and assigns of BWW. Guaranty ¶¶ 6, 9.

In a separate action, 47 E. 34th St. obtained a judgment in the amount of $10,908,400.91 against BridgeStreet Corporate Housing for breach of the Lease in connection with BridgeStreet Corporate Housing's use of the premises in violation of the terms of the Lease resulting in the building losing its eligibility for certain tax abatement benefits.  Notice of Removal ¶ 7; *see 47 East 34th Street (NY), L.P. v. BridgeStreet Corporate Housing, LLC*, Index No. 653320/2015 (the "Lease Action").  In an effort to collect on its damages for that breach, Plaintiff filed the instant action to enforce the Guaranty.  Notice of Removal ¶ 8.

Apart from BWW, Plaintiff in the instant action named six other Defendants, including the remaining Defendants Domus Funding and Versa, alleging that they were each liable for the

guaranteed obligations although they were not parties to the Guaranty. Defendant Domus Funding was a secured lender to BWW under a January 21, 2011 Credit Agreement (the "2011 Credit Agreement") and was an agent on that loan facility. Notice of Removal ¶ 10; *see* Dkt. No. 1-2. On March 3, 2014, Domus Funding foreclosed on BWW's assets, including BWW's ownership interest in BridgeStreet Corporate Housing.[1] *Id.* ¶ 11; *see* Dkt. Nos. 20-8-10. Plaintiff alleges that the following day, BWW dissolved (together with the March 3, 2013 foreclosure, the "March 3-4 Transaction"). *Id.* ¶ 12; FAC ¶¶ 7, 77. Plaintiff alleges that as part of the March 3-4 Transaction, "Versa and Domus [Funding] assumed direct or indirect ownership and/or control over BWW and BridgeStreet [Corporate Housing], including control over BridgeStreet [Corporate Housing's] performance under the Lease." FAC ¶ 40.[2] Thereafter, Plaintiff alleges, "Versa and Domus [Funding] continued to operate BWW and BridgeStreet Corporate Housing at the same location, under the same name, 'BridgeStreet Global Hospitality.'" *Id.* ¶ 8. *See also id.* ¶ 40 ("Versa and Domus [Funding] continued to operate

---

[1] The parties characterize differently the nature and circumstances of this event. Plaintiff, in the Notice of Removal characterizes it as a "foreclosure" executed by Domus Funding "acting solely as agent and on behalf of another lender, Domus Group, LLC" and states that the foreclosed assets were "immediately transferred" to that lender. *Id.* ¶ 11. In their opposition brief, Defendants characterize the March 3, 2014 Transaction as an acquisition whereby Domus "acquired 100% of the membership interests (100% of the equity) of BridgeStreet [Corporate Housing] . . . [as well as] all or substantially all of the assets of BWW, including all of the equity in and assets of its ongoing business operations," and makes no statement about the capacity in which Domus Funding make such acquisition—as agent to a credit facility or otherwise—or whether the assets were transferred to Domus Group, LLC. Dkt. No. 19 at 3-4; *see also* FAC ¶ 37 ("[O]n March 4, 2014, BWW . . . assigned all of its assets to third-party insiders controlled by Versa and Domus [Funding]"); Notice of Removal ¶ 13 ("Plaintiff alleges in its pleadings in this case—incorrectly as the facts have since shown—that Domus Funding and Versa Capital [] were transferees of essentially all of [BWW's] assets as a result of the March 3, 2014 foreclosure."). The Court need not adjudicate these distinctions for purposes of the instant motion, as resolving it depends on Plaintiff's remaining claims and Defendant's potential liability, and not on what the facts adduced in discovery so far establish.

[2] Plaintiff alleges "Domus is wholly-owned, directly or indirectly, by Versa, and was formed to facilitate Versa's acquisition of BWW's business." FAC ¶ 43.

BWW's business under the same name, BridgeStreet Global Hospitality, with the same properties, and with the same employees and executives . . .").  Plaintiff alleges that "[a]s a result of [the March 3-4 Transaction] . . . (i) Versa and Domus became the successor in interest to BWW, as Guarantor, under the Guaranty, and (ii) the members of the BWW board . . . became personally liable for all of BWW's obligations under the Guaranty."  *Id.* ¶ 41.  The FAC brought claims for enforcement of the Guaranty, FAC ¶¶ 59-64; breach of contract for alleged breaches of the Guaranty Agreement, *id.* ¶¶ 65-71; unlawful assignments of BWW assets in connection with the dissolution of BWW, *id.* ¶¶ 72-78; fraudulent conveyance in connection with the transfer of BWW assets to Domus Funding and Versa, *id* ¶¶ 79-86; tortious interference with the Guaranty Agreement, *id.* ¶¶ 87-90; fraudulent concealment for failure to disclose material facts concerning the Guaranty Agreement *id*, ¶¶ 91-94; fraudulent and/or negligent misrepresentation with respect to representations about the Guaranty Agreement, *id.* ¶¶ 95-99; and piercing the corporate veil, by which claim Plaintiff alleges Versa and Domus Funding dominated and controlled BWW, that they "continue to dominate, control and operate BWW's business under the guise" of a different entity, "BridgeStreet Global Hospitality, as the alter ego of Versa and Domus [Funding]," and that such domination and control "caused [Plaintiff] economic injury by stripping [BWW] of all assets and leaving it unable to satisfy its obligations to [Plaintiff] under the Guaranty," *id.* ¶¶ 100-104.

On November 6, 2019, the New York Supreme Court entered a decision and order on Defendants' motion to dismiss and Plaintiffs' cross-motion for partial summary judgment.  Dkt. No. 20-14 ("November Decision").  The court dismissed the fifth, sixth, and seventh causes of action, for tortious interference, fraudulent concealment, and fraudulent and/or negligent misrepresentation, and dismissed the fourth cause of action for fraudulent conveyance as against

Versa only.  *See* November Decision at 18-23.  The court denied Defendants' motion to dismiss as to Plaintiff's claims for enforcement of the Guaranty, breach of contract, and piercing the corporate veil.  It denied Plaintiff's motion for partial summary judgment against Versa and Domus Funding on the grounds that issues of fact remained as to whether those parties were liable under the Guaranty as successors of BWW.  *See id.* at 16-18.  In particular, after rejecting the argument that successor liability could be established through a finding that the March 3-4 Transaction effected a de facto merger between BWW and Defendants, *see id.* at 12-16, the court held that issues of fact remained as to whether successor liability applied under the "mere continuation" doctrine, including facts "regarding the location of the business before and after the [f]oreclosure [of BWW] and the degree to which there was continuity of employees and management" as between BWW and the Defendants.  *Id.* at 18.

On November 25, 2020, BridgeStreet Corporate Housing filed a chapter 7 bankruptcy petition in the Eastern District of Virginia, *In re HCB (2020), LLC*, Case No. 20-12600 (Bankr. E.D. Va. 2020) ("Debtor Action").  The same day, the Notice of Removal was filed in this case.  The instant motion followed.

## LEGAL STANDARD

"A party seeking to remove an action from state to federal court bears the burden of establishing federal jurisdiction.  *Trs. of Masonic Hall & Asylum Fund v. Pricewaterhousecoopers LLP*, 2009 WL 290543, at *3 (S.D.N.Y. Feb. 6, 2009) (Lynch, J.); *see Linardos v. Fortuna*, 157 F.3d 945, 947 (2d Cir. 1998).  As a general matter, "there is a presumption against removal, and uncertainties tend to weigh in favor of remand."  *Harraz v. EgyptAir Airlines Co.*, 2019 WL 6700946, at *2 (S.D.N.Y. Dec. 9, 2019).  "[O]ut of respect for the limited jurisdiction of the federal courts and the rights of states, we must resolve any doubts

against removability." *In re Methyl Tertiary Butyl Ether Prod. Liab. Litig.*, 488 F.3d 112, 124

(2d Cir. 2007) (citation and internal quotation marks omitted).

Defendants argue removal is proper pursuant to 28 U.S.C. § 1452(a) and 28 U.S.C. §

1334(b). Section 1452(a) provides:

> A party may remove any claim or cause of action . . . to the district court for the district where such civil action is pending, if such district court has jurisdiction of such claim or cause of action under section 1334 of this title.

28 U.S.C. § 1452(a). Section 1334(b), in turn, provides:

> Except as provided in subsection (e)(2), and notwithstanding any Act of Congress that confers exclusive jurisdiction on a court or courts other than the district courts, the district courts shall have original but not exclusive jurisdiction of all civil proceedings arising under title 11, or arising in or related to cases under title 11.

28 U.S.C. § 1334(b)

The three types of jurisdiction that a district court may exercise pursuant to Section

1334(b) "are colloquially referred to as 'arising under,' 'arising in,' and 'related to' jurisdiction."

*KeyBank Nat'l Ass'n v. Franklin Advisers, Inc.*, 600 B.R. 214, 225 (S.D.N.Y. 2019) (quoting

*Lothian Cassidy, LLC v. Lothian Expl. & Dev. II, L.P.*, 487 B.R. 158, 161 (S.D.N.Y. 2013)).

"Proceedings 'arising under' the Bankruptcy Code are those 'that clearly invoke substantive

rights created by federal bankruptcy law.'" *In re Robert Plan Corp.*, 777 F.3d 594, 596 (2d Cir.

2015) (quoting *MBNA Am. Bank, N.A. v. Hill*, 436 F.3d 104, 108–09 (2d Cir. 2006)); *see also*

*KeyBank Nat'l Ass'n*, 600 B.R. at 225 ("'Arising under' jurisdiction exists in 'any matter under

which a claim is made under a provision of title 11.'") (quoting *In re Salander—O'Reilly*

*Galleries, LLC*, 475 B.R. 9, 27 (S.D.N. Y. 2012)). "Proceedings 'arising in' a bankruptcy case

are those 'claims that are not based on any right expressly created by [the Bankruptcy Code], but

nevertheless, would have no existence outside of the bankruptcy.'" *In re Robert Plan Corp.*, 777

F.3d at 596–97 (quoting *Baker*, 613 F.3d at 350–51); *see also Geruschat v. Ernst Young LLP (In*

*re Seven Fields Dev. Corp.*), 505 F.3d 237, 260 (3d Cir. 2007) ("[C]laims that 'arise in' a

bankruptcy case are claims that by their nature, not their particular factual circumstances, could

only arise in the context of a bankruptcy case.") (citation omitted). Finally, "related to"

jurisdiction exists if the "outcome of the proceeding could conceivably have any effect upon the

debtors' estate being administered." *In re Robert Plan Corp.*, 777 F.3d at 597 (quoting *In re

Turner*, 724 F.2d 338, 341 (2d Cir.1983)); *see In re Cavalry Constr., Inc.*, 496 B.R. 106, 111

(S.D.N.Y. 2013) ("[C]ivil proceedings are 'related to cases under title 11' if the outcome of those

proceedings in any way impacts upon the handling and administration of the bankrupt estate.")

(internal quotation marks and citation omitted). Cases that either "arise under" or "arise in" the

Bankruptcy Code are deemed "core" proceedings, while those that merely "relate to" a case

under the Bankruptcy Code are "non-core" proceedings. *In re Robert Plan Corp.*, 777 F.3d at

596-97.

Even where a district court has subject matter jurisdiction over an action sought to be

removed pursuant to Section 1334(b), it may exercise permissive abstention. *See* 28 U.S.C. §

1334(c) ("[N]othing in this section prevents a district court in the interest of justice, or in the

interest of comity with State courts or respect for State law, from abstaining from hearing a

particular proceeding arising under title 11 or arising in or related to a case under title 11.");

*KeyBank Nat'l Ass'n*, 600 B.R. at 225-26 (quoting *Lothian Cassidy.*, 487 B.R. at 165) (citing

permissive abstention factors).[3]

### DISCUSSION

Defendants contend that the Court has jurisdiction under Section 1334(b) because

Plaintiff's claims "arise in" or are "related to" the Debtor Action.[4]  As set forth below, the claims

---

[3] Plaintiff has not moved for mandatory abstention pursuant to 28 U.S.C. § 1334(c)(2).

[4] Plaintiff does not argue that Plaintiff's claims "arise under" the Debtor Action, as none of the

7

do not "arise in" the Debtor Action because they involve only state law claims among non-debtors to enforce a contract formed prior to commencement of the Debtor Action. Defendants make a persuasive argument that the action is "related to" the Debtor Action based on Defendants' potential claims for indemnification against the Debtor under the 2011 Credit Agreement of which Debtor is a guarantor. However, the permissive abstention factors strongly support abstention. The Court therefore abstains and remands.

### A. The claims in this action do not "arise in" the Debtor Action

"[C]laims for pre-[bankruptcy] petition contract damages are generally non-core." *See ICICI Bank Ltd. v. Essar Glob. Fund Ltd.*, 565 B.R. 241, 249 (S.D.N.Y. 2017) (collecting cases); *see In re Orion Pictures Corp.*, 4 F.3d 1095, 1102 (2d Cir. 1993) ("It is clear that to the extent that the claim is for pre-petition contract damages, it is non-core."). Accordingly, numerous cases within this district have held that a non-debtor's claim against another non-debtor to enforce a guarantee of an obligation by a third-party debtor does not "arise under" or "arise in" a bankruptcy proceeding involving that third-party, because such claims neither involve "substantive rights created by federal bankruptcy law" nor "would have no existence outside of the bankruptcy". *In re Robert Plan Corp.*, 777 F.3d at 596–97; *see, e.g.*, *In re Eight-115 Assocs., LLC*, 2021 WL 973998, at *9 (Bankr. S.D.N.Y. Mar. 16, 2021) ("It is very clear that this contractual claim [to enforce a guarantee of a debtor's obligations] between two non-debtor parties is non-core"); *ICICI Bank Ltd.*, 565 B.R. at 249 (claims for guaranty of debtor's obligations, brought against non-debtor parties, is non-core); *In re Extended Stay Inc.*, 435 B.R. 139, 149 (S.D.N.Y. 2010) (affirming bankruptcy court determination that claims against guarantors of an obligation held by a third-party bankruptcy debtor did not "arise under" or

claims is brought pursuant to the Bankruptcy Code.

"arise in" the debtor action where "[t]he claims are asserted in state law terms only; [plaintiff] seeks recovery pursuant to contracts in which [defendants] agreed to backstop a specific liability under the relevant circumstances").

*In re Extended Stay Inc.*, 418 B.R. 49, 58 (Bankr. S.D.N.Y. 2009), *aff'd in part*, 435 B.R. at 149 (S.D.N.Y. 2010), rejected an argument that state law claims for guarantees fell within the court's Section 1334(b) jurisdiction where those guarantees bore a closer relationship to the underlying debtor action than the instant claims, as the guarantee obligations were only triggered by the debtor's bankruptcy filing. Even in that circumstance, the bankruptcy court held, and the district court affirmed, that "arising in" jurisdiction was absent because the claims were not such as "by their nature . . . could only arise in the context of a bankruptcy case." *Geruschat*, 505 F.3d at 260; *see In re Extended Stay Inc.*, 418 B.R. at 58 (quoting *Geruschat*, 505 F.3d at 260). The court stated:

> [T]he Debtors' bankruptcy cases serve as the event of default triggering the [g]uarantors' liability under the [g]uaranty [a]greements. However, claims such as this brought by a non-debtor against a non-debtor involving guarantees are not claims that by their nature could arise only in the context of a bankruptcy case. To the contrary, claims against non-debtor guarantors routinely are brought and adjudicated in state court. . . . Thus, claims made by Bank of America do not 'arise in' a case under the Bankruptcy Code.

*In re Extended Stay Inc.*, 418 B.R. at 58 (internal citation omitted); *see In re Extended Stay Inc.*, 435 B.R. at 149 ("The [c]ourt concurs with the Bankruptcy Court's determination that [plaintiff's] claims do not 'arise in' [d]ebtor's bankruptcy cases, for substantially the reasons stated in the [b]ankruptcy [c]ourt's [d]ecision."); *cf. In re Coudert Bros.*, 2011 WL 7678683, at *5 (S.D.N.Y. Nov. 23, 2011) ("Where a contract sued upon was formed prior to the bankruptcy petition, it will generally be highly unlikely that a proceeding based on that contract turns on the bankruptcy laws."); *In re U.S. Lines, Inc.*, 197 F.3d 631, 637 (2d Cir. 1999) ("The critical

question in determining whether a contractual dispute is core by virtue of timing is not whether the *cause of action* accrued post-petition, but whether the *contract* was formed post-petition.").

Defendants argue that Plaintiff brings claims not only to enforce the Guaranty—which claims do not "arise under" or "arise in" the Debtor Action—but also to enforce the Lease itself against Defendants as successors to BridgeStreet Corporate Housing. *See* Dkt. No. 23 at 10. That argument is contradicted by both the face of the FAC and the November Decision, as further confirmed by Plaintiff's representations to this Court in the context of this motion.[5] The FAC states that Plaintiff "seeks to recover damages and enforce the Guaranty against the Guarantor, BridgeStreet WorldWide, Inc. [] and its successors in interest, Versa [] and Domus [Funding] as well as certain of their officers and directors." FAC ¶ 1. Nowhere does it state that it seeks to enforce the Lease against any named Defendant. Each of the causes of action, including those that were not dismissed by the November Decision—claims for enforcement of the Guaranty, breach of contract, fraudulent conveyance, and piercing the corporate veil—alleges Defendants' failure to discharge obligations under the Guaranty; they do not allege Defendants' failure to discharge obligations under the Lease. That much is self-evident as to the first and second causes of action, which seek 1) to enforce the Guaranty, and 2) to hold Defendants liable for breach of the Guaranty. *See* FAC ¶ 62 ("BWW, together with Versa and Domus *as BWW's successors in interest*, are obligated to pay all amounts due to 47 East under the Guaranty arising from BridgeStreet[] [Corporate Housing's] breach of the Lease, including all damages awarded [against BridgeStreet in a separate and related action]") (emphasis added); *id.* ¶¶ 67 ("Versa and

---

[5] Plaintiff reiterates in its briefs and unequivocally stated at argument that it is not seeking to hold Defendants liable as successors to BridgeStreet Corporate Housing under the Lease, and that it is only pursuing claims against Defendants as successors to BWW under the Guaranty. As the Court made clear it would at argument, it has relied on that representation in its decision.

Domus [Funding], individually and together, are contractually obligated, *as BWW's successors interest* [sic], to pay all amounts due to 47 East *under the Guaranty* arising from BridgeStreet[] [Corporate Housing's] breach of the Lease.") (emphasis added); *id*. at 70 ("In breach of their obligations *under the Guaranty*, BWW, Versa and Domus [Funding] ignored [a] Demand Letter [demanding payment under the Guaranty], failed to honor the Guaranty, and required 47 East to commence the instant enforcement action.") (emphasis added). It is also plain from the fourth cause of action for fraudulent conveyance—sustained by the November Decision as against Versa—and the eighth cause of action for piercing the corporate veil. Plaintiff's claim for fraudulent conveyance asserts that assets of BWW were conveyed with the "intent to hinder, delay or defraud present or future creditors of BWW, including 47 [E. 34th St.]," *id*. ¶ 84, and that such conveyances "should be set aside and used to pay in full all obligations owed to 47 [E. 34th St.] *under the Guaranty* . . .," *id*. ¶ 86 (emphasis added). Similarly, Plaintiff's claim for piercing the corporate veil seeks to impute to Defendants BWW's liability under the Guaranty— not under the Lease—on grounds that "[a]t all relevant times, Versa and Domus dominated and controlled BWW, and Versa and Domus [Funding] continue to dominate, control and operate BWW's business under the guise of BridgeStreet Global Hospitality, as the alter ego of Versa and Domus [Funding]." *Id*. ¶ 101. Plaintiff thus claims that "the corporate veil of BWW should be pierced and Versa and Domus [Funding] held liable for all amounts owed to 47 [East] by BWW under the Guaranty . . ." *id*. ¶ 104. It further follows that because Plaintiff seeks to enforce rights only under the Guaranty, Defendants are sued only as successors to BWW; Debtor is not a party under the Guaranty and Plaintiff would have no rights under the Guaranty to pursue claims against any successor to Debtor. Plaintiff's rights against successors to Debtor lie only under the Lease itself.

The November decision likewise reflects that Plaintiff's claims arise from the Guaranty, not from the Lease, and narrows the remaining issues in the case to questions about whether BWW's corporate veil can be pierced to hold Versa and Domus Funding liable under the Guaranty. The November Decision accurately characterized the FAC as "alleg[ing] that 'the Guaranty, by its terms, irrevocably and indefinitely binds [BWW] and its successors and assigns to all obligations arising under the Guaranty,' and that because [Versa and Domus Funding] are successors in interest to [BWW], [they] are obligated to pay all amounts due to 47 East arising from BridgeStreet's breach of the Lease." November Decision at 10 (quoting FAC ¶¶ 60-62). The November Decision denied summary judgment on grounds that issues of fact remained as to whether the Defendants were successors of BWW under the "mere continuation" doctrine, which imposes successor liability where the "acquiring corporation has obtained the business location, employees, management, and good will of the acquired corporation." *Id*. at 16. The court concluded that "[w]hile the [FAC] sufficiently pleads the elements of 47 East's successor liability claims under the mere continuation doctrine . . . there are issues of fact regarding the location of [BWW's] business before and after the Foreclosure and the degree to which there was continuity of employees and management." *Id*. at 18. In short, the remaining issues are whether Defendants are liable under the Guaranty as successors to BWW—not whether they are liable under the Lease as successors of BridgeStreet Corporate Housing.

Defendants argue, nevertheless, that Plaintiff is pressing claims that Defendants are liable under the Lease as successors or assigns of BridgeStreet Corporate Housing. They point to statements Plaintiff has made in briefs on motions before the state court—the cross motions to dismiss and for summary judgment, and a subsequent motion for attachment—in which Plaintiff

does appear to assert that Defendants are liable as a successor or assignee under the Lease.[6] They also point to certain statements in the FAC that Defendants continued—to this day, and including after BWW was allegedly dissolved—to dominate and control BridgeStreet Corporate Housing, in addition to BWW. *See, e.g.*, FAC at 15 (heading: "Versa/Domus Controlled Breach of Lease and Guarantee"); *id.* ¶ 54 ("From and after March 2014 . . . Versa and Domus [Funding] exercised complete domination and control over BridgeStreet and its performance under the Lease, as well as complete domination and control over BWW and its performance under the Guaranty."); *id.* ¶¶ 8, 57 ("Versa and Domus [Funding] continue to dominate and control BWW and BridgeStreet, either directly or indirectly, and continue conducting business as BridgeStreet Global Hospitality"); *id.* ¶ 58 (Versa and Domus "cannibalized BridgeStreet and BWW"). At oral argument, Defendants emphasized that under New York law, the state court is permitted to "grant any type of relief within its jurisdiction appropriate to the proof whether or not demanded, imposing such terms as may be just." C.P.L.R. § 3017(a). They thus allege that based on the allegations in the FAC regarding Defendants' domination of BridgeStreet, the court could conceivably enter judgment against BridgeStreet.

---

[6] For example, in Plaintiff's brief opposing Defendants' motion to dismiss and in support of Plaintiff's cross motion for summary judgment, Plaintiff stated that it "seeks a determination that [Defendants], as the successor[s] to the Guarantor *and/or* the assignee of the Lease, are liable for *all* damages awarded against BridgeStreet . . .," Dkt. No. 13-113 at 2 (emphasis added to "and/or"); that it "seeks to enforce the Guaranty *and Lease* against [Defendants] as the successors and assigns of BWW *and BridgeStreet* [Corporate Housing] and recover the full amount of all damages awarded." *Id.* at 9 (emphasis added); and that it "moves for partial summary judgment . . . on the successor liability claims asserted against the [Defendants] based on [*inter alia*] (1) their *assumption* of the Lease when they purchased 100% of the equity of BridgeStreet", *id.* at 15. In briefing on a subsequent motion for an order of attachment, brought in March 2020, after the November Decision, on grounds that Defendants were illicitly "draining BridgeStreet of all cash" in an effort to avoid satisfying liabilities to Defendants. Dkt. No. 14-103.

Defendants have failed to establish that Plaintiff has, by this action, brought anything other than claims for Defendants' liability under the Guaranty as successors to BWW. As Defendants admitted at oral argument, the operative document to determine whether a case is properly removed is the complaint itself; statements that are made in briefs may help to interpret the complaint but they cannot themselves vest the federal court with jurisdiction. *See Kudlek v. Sunoco, Inc. (R & M)*, 581 F. Supp. 2d 413, 416 (E.D.N.Y. 2008), *adhered to on reconsideration sub nom. Kudlek v. Sunoco, Inc.*, 610 F. Supp. 2d 218 (E.D.N.Y. 2009) ("Courts determine whether subject matter jurisdiction exists by 'looking to the complaint as it existed at the time the petition for removal was filed.'") (quoting *Hill v. Delta Int'l Mach. Corp.*, 386 F. Supp. 2d 427, 429 (S.D.N.Y.2005)). It is also an elementary principle of federal jurisdiction that absent some exception such as the artful pleading rule,[7] the face of the complaint controls—not arguments Plaintiff has made in motions briefing or causes of action that *could have been* but *were not in fact* brought. *Cf. Kudlek*, 581 F. Supp. 2d at 416-17 ("[D]etermining whether a particular case arises under federal law turns on the 'well-pleaded complaint rule,' which provides that federal question jurisdiction exists 'only when a federal question is presented on the face of the plaintiff's properly pleaded complaint.'") (quoting *Caterpillar Inc. v. Williams*, 482 U.S. 386, 392 (1987)). While there are stray sentences in the FAC that allege Defendants' domination of BridgeStreet through their alleged control and operation of BridgeStreet Global Hospitality, such allegations are made in service of the argument that Defendants are liable as successor under the Guaranty. They are not made to assert Defendants' liability as a successor to BridgeStreet under the Lease. Indeed, the November Decision explicitly narrowed the remaining factual issues in the case to those implicating Defendants' liabilities as successors to BWW under the "mere

---

[7] Not applicable here. *See generally Romano v. Kazacos*, 609 F.3d 512, 518-20 (2d Cir. 2010).

continuation" doctrine.  *See supra*.[8]  As recognized by both parties at oral argument, Plaintiff

would be estopped by its representations in the course of this motion from arguing in any future

motion that it seeks to enforce the Lease against Defendants as successors of BridgeStreet.  *See*

*Intellivision v. Microsoft Corp.*, 484 F. App'x 616, 619 (2d Cir. 2012) ("[Judicial estoppel[]

generally prevents a party from prevailing in one phase of a case on an argument and then

relying on a contradictory argument to prevail in another phase.") (quoting *New Hampshire v.*

*Maine*, 532 U.S. 742, 749 (2001)); *see supra* n.5.

Finally, Defendants argue (1) that Plaintiff cannot prevail on a theory that Defendants are

successors to Worldwide and therefore must be proceeding on a theory that they are successors

to BridgeStreet Corporate Housing; and (2) that, notwithstanding Plaintiff's express disavowal

that it would proceed on any theory that Defendants were the successor of Bridgestreet Corporate

Housing, the state court might *sua sponte* and pursuant to its own authority under C.P.L.R. §

3017(a)[9] grant Defendants relief based on such theory.  Those arguments are insufficient to

---

[8] Indeed, Plaintiff's reliance on the "mere continuation" doctrine may help explain why the FAC contains allegations by Defendants of domination over BridgeStreet as well as BWW.  The FAC alleges "Versa and Domus [Funding] continued to operate BWW and BridgeStreet [Corporate Housing] at the same location, under the same name, 'BridgeStreet Global Hospitality.'"  *Id.* ¶ 8; *see also id.* ¶ 101 ("At all relevant times, Versa and Domus dominated and controlled BWW, and Versa and Domus continue to dominate, control and operate BWW's business under the guise of BridgeStreet Global Hospitality, as the alter ego of Versa and Domus.").  Crediting this allegation, it is consistent with a theory that Defendants continued to operate BWW's business after its dissolution—as required to prevail on a claim of "mere continuation," *see* November Decision at 16-18—that Defendants "continued" to dominate both BWW and BridgeStreet Corporate Housing under the name BridgeStreet Global Hospitality.  The fact that Plaintiff's direct claims here against non-debtor third parties share a factual predicate with hypothetical claims against the Debtor that would be derivative of claims brought by the Trustee in the Debtor Action does not make these claims derivative.  *Cf. In re Bernard L. Madoff Inv. Sec., LLC*, 2013 WL 5511027, at *4 (S.D.N.Y. Sept. 30, 2013) (Sullivan, J.) ("It is well established that a debtor estate's claims against a third party and an estate creditor's claims against the same party are not duplicative or derivative merely because they are based on the same facts.").

[9] C.P.L.R. § 3017(a) provides, in relevant part: "Except as provided in section 3215, the court

establish federal jurisdiction on an "arising in" basis. Federal jurisdiction turns on the claims that Plaintiff alleges in state court; it cannot be manufactured on the supposition that the state law claims lack merit and therefore there must be some other claim "latent"—as Defendants have argued, *see* Tr. at 36-37—in Plaintiff's pleadings but which Plaintiff has not pursued (and has disavowed) that would give rise to federal jurisdiction. The plaintiff is the "master" of its complaint and in that capacity determines which causes of action to bring and which to omit— irrespective of the viability of those claims. *See Holmes Grp., Inc. v. Vornado Air Circulation Sys., Inc.*, 535 U.S. 826, 831 (2002). Defendants' argument based on C.P.L.R. § 3017(a) is no more successful. The law pertains to the Court's power to award appropriate but unrequested "relief" when an asserted claim justifies such relief. *See Juarez-Cardoso v. La Flor de Santa Ines, Inc.*, 2017 WL 4357009, at *20 (E.D.N.Y. Sept. 29, 2017) ("In awarding damages, the Court is not limited to the relief requested in the complaint, but rather may award any relief that it deems just and proper."); *Romero v. Rung Charoen Sub, Inc.*, 2017 WL 4480758, at *11 (E.D.N.Y. Sept. 30, 2017) (citing C.P.L.R. § 3017(a)); ("In awarding damages, the Court is not limited to the relief requested in the complaint, but rather may award any relief that it deems just and proper.") (citing C.P.L.R. § 3017(a)). It does not permit a court to substitute a claim that is not alleged by a party, and as to which no defense has been asserted, in order to grant relief that is requested but that would fail on the claims that are asserted. The argument also runs afoul of the principles that "there is a presumption against removal," *Harraz*, 2019 WL 6700946, at *2, and that any doubts must be resolved "against removability." *In re Methyl Tertiary Butyl Ether*

---

may grant any type of relief within its jurisdiction appropriate to the proof whether or not demanded, imposing such terms as may be just." The rule permits the court to grant unrequested relief only in the absence of substantial prejudice. *See, e.g.*, *Czajka v. Pendell*, 174 A.D.3d 970 (3d Dept. 2019); *Torre v. Giorgio*, 51 A.D.3d 1010 (2d Dept. 2008); *Rebmann v. Wicks*, 858 N.Y.S. 2d 765 (2d Dept. 1999).

*Prod. Liab. Litig.*, 488 F.3d at 124. Were Defendants' argument to be accepted, the federal court would take jurisdiction not only of claims that Plaintiff is pursuing but of all cases in which the legal possibility exists that the Plaintiff could pursue a claim that would invoke federal jurisdiction. Not surprisingly, Defendants cite no authority for that expansive interpretation of the scope of federal subject matter jurisdiction.

This case is thus distinguishable from the sole case Defendants rely on, *Harrison v. Soroof Int'l Inc.*, 320 F. Supp. 3d 602 (D. Del. 2018). In that case, the district court held that a claim for alter ego liability was the property of the bankruptcy estate where the plaintiff alleged that a non-debtor third party was an alter ego *of the debtor* in a bankruptcy action. *See id*. at 614-627. Here, BWW is not the Debtor—BridgeStreet Corporate Housing is. Just as a claim for liability under the Guaranty Agreement brought directly against BWW does not "arise in" or "arise under" the Debtor Action, *see*, *e.g.*, *In re Extended Stay Inc.*, 435 B.R. at 149, neither does a claim that Defendants here are liable under the same instrument as successors to BWW.

**B.     This action is "related to" the Debtor Action**

Defendants are correct, however, that the instant action is "related to" the Debtor Action because they have a reasonable legal basis to assert a claim for indemnification against the Debtor pursuant to the 2011 Credit Agreement.[10]  *See id*. at 13-14. Viable indemnification claims against a debtor that could be brought by a non-debtor defendant can be a basis for

_____

[10] Defendants also argue that they have a reasonable claim for indemnification pursuant to a subsequent credit agreement executed in 2014. That argument is substantially more tenuous. Unlike the claim for indemnification under the 2011 Credit Agreement which is based on the fact that the FAC arises from conduct Defendants took pursuant to that agreement, the claim for indemnification under the 2014 Credit Agreement is based on conduct that postdates Defendants' assumption of BWW's assets and obligations and is at best incidental to the FAC. The Court need not conclude, however, that the claim for indemnification under the 2014 Credit Agreement is entirely meritless. Even if Defendants had a reasonable indemnification claim under the 2014 Credit Agreement, the Court would still abstain for the reasons provided.

establishing "related to" jurisdiction, even where such claims have not yet been brought. *See, e.g., In re Extended Stay Inc.*, 435 B.R. at 150 (the potential for an indemnification claim by non-debtor defendant was sufficient to render action "related to" debtor's bankruptcy proceeding); *Sokola v. Weinstein*, 2020 WL 3605578, at *9 (S.D.N.Y. July 2 2020) ("There is no doubt that potential claims by a third party for indemnification against a debtor entity . . . can support the assertion of 'related to' jurisdiction over the action in which the indemnification obligation could arise.") (citation omitted). "[T]he mere assertion of an indemnity claim against a debtor, no matter how baseless, cannot trigger bankruptcy jurisdiction." *In re Chateaugay Corp*, 213 B.R. 633, 640 (S.D.N.Y. 1997). Thus, "[i]n determining whether potential claims by third party defendants against the debtor for either indemnification or contribution give rise to 'related to' jurisdiction over litigation to which the debtor is not a party, courts in this circuit . . . have generally found jurisdiction where there is a 'reasonable' legal basis for the claim." *SPV Osus Ltd. v. UBS AG*, 882 F.3d 333, 340 (2d Cir. 2018) (quoting *In re WorldCom, Inc. Sec. Litig.*, 293 B.R. at 319 (collecting cases)). Where there is a reasonable legal basis for such a claim, "the removed action could have a 'conceivable effect' on 'the debtor's rights, liabilities, options or freedom of action' and could 'impact[ ] upon the handling and administration of the bankrupt estate.'" *Sokola*, 2020 WL 3605578, at *9 (quoting *Celotex Corp. v. Edwards*, 514 U.S. 300, 308 n.6 (1995)).

Here there is a reasonable legal basis for an indemnification claim by Defendants against the Debtor. It is essential to Plaintiff's theory of liability that Defendants dominated and controlled BWW, and assumed BWW's asserts and obligations, and are therefore liable as alter egos and/or successors of BWW under the Guaranty. While the parties dispute the proper characterization of the March 3-4 Transaction, *see supra* n.1, Plaintiff does not dispute that it

was by exercising rights under the 2011 Credit Agreement that Defendants were able to allegedly

assert control over BWW and seize its assets. Plaintiff admitted as much at oral argument:

> The Court: How did [Defendants] become the successors to [BWW]? How did they assume management?
>
> Plaintiff's counsel: In March 2014, they caused [BWW] to execute these assignments, assign all the assets to themselves.
>
> The Court: And what gave them the right to do that?
>
> Plaintiff's counsel: Their right to do that . . . arose out of the credit agreement.

Tr. At 12.

> The 2011 Credit Agreement contains an indemnification provision. It provides:
>
> [BWW] agrees to defend . . ., indemnify, pay, and hold harmless the Agent, the Collateral Agent, and the Lenders [which, as of the March 3-4 Transaction, included Domus Funding] . . . from and against any and all Indemnified Liabilities. . . .

Dkt. No. 2-2 at 88. Indemnified Liabilities include:

> "[A]ny and all liabilities, obligations, losses, damages . . . penalties, actions, judgments, suits, claims . . . costs . . . expenses and disbursements of any kind or nature whatsoever (including the reasonable fees and disbursements of counsel for Indemnitees[)] . . . in connection with any . . . judicial proceeding commenced or threatened by any Person . . . in any manner relating to or arising out of (i) this Agreement or the other Loan Documents or the transactions contemplated hereby or thereby (including . . . any enforcement of the Loan Documents (including any sale of, collection from, or other realization upon any of the Collateral[)] . . .

*Id.* at 89.

BridgeStreet is a guarantor of the 2011 Credit Agreement pursuant to a 2007 subsidiary

guaranty, executed by BridgeStreet, which provides in relevant part that "Guarantors [including

BridgeStreet] are willing irrevocably and unconditionally to guaranty [the Guaranteed

Obligations]." Dkt. No. 1-4 ¶ F. "Guaranteed Obligations" refer, inter alia, to obligations under

a 2007 credit agreement including obligations "arising under successive borrowing transactions

under the [2007 credit agreement] which shall either continue the [o]bligations [therein] or from

time to time renew them after they have been satisfied." *Id.* ¶ 1(a). The 2011 Credit Agreement is, in turn, an amendment to the 2007 credit agreement and is thus subject to the same guaranty. Defendants have interposed claims for indemnification against BridgeStreet in the Debtor Action. *See* Dkt. Nos. 25-3, 25-3.

Based on the foregoing evidence, the Court is satisfied that there is at least a "reasonable legal basis" for a potential indemnification claim against BridgeStreet. *See SPV Osus Ltd.*, 882 F.3d at 340. Insofar as the 2011 Credit Agreement was the instrument of Defendants' alleged control of BWW, Defendants have a reasonable claim that the allegations in the FAC "relate[] to or ar[ose] out of" the 2011 Credit Agreement, triggering the indemnification provision, Dkt. No. 2-2 at 89. Thus there is a reasonable legal basis for them to claim entitlement to indemnification from BridgeStreet as a guarantor of that agreement. It is not relevant to the existence of federal jurisdiction that the corpus of the bankruptcy estate might turn out not to be sufficient to satisfy Defendant's claim. *See SPV Osus*, 882 F.3d at 340 (rejecting an argument that "related to" jurisdiction was absent because there was "not enough money" in the estate to pay out the claims at issue on grounds that (1) "[w]hile a payout by the estate to defendants may be improbable, it is not impossible" and (2) "[i]n addition, any claim by defendants potentially alters that distribution of assets among the estates' creditors"). "Related to" jurisdiction turns on the legal viability of the claim to indemnification, not on whether it will be paid should it be reduced to a judgment. Just as in *SPV Osus*, indemnification claims by Defendants against the Debtor could "potentially alter" the "distribution of assets among the estates' creditors," which "support[s] a finding that this litigation is 'related to' the [Debtor Action]," regardless of whether Defendants are likely to recover the full value of their claim. *Id.*; *see also Sokola*, 2020 WL 3605578, at *9.

**C.       Permissive abstention is appropriate**

Although the Court has "related to" subject matter jurisdiction under Section 1334(b), the Court concludes that abstention is appropriate.

In determining whether to exercise permissive abstention under Section 1334(c), courts consider the following factors:

> (1) the effect or lack thereof on the efficient administration of the estate if a Court recommends abstention, (2) the extent to which state law issues predominate over bankruptcy issues, (3) the difficulty or unsettled nature of the applicable state law, (4) the presence of a related proceeding commenced in state court or other nonbankruptcy court, (5) the jurisdictional basis, if any, other than 28 U.S.C. § 1334, (6) the degree of relatedness or remoteness of the proceeding to the main bankruptcy case, (7) the substance rather than form of an asserted 'core' proceeding, (8) the feasibility of severing state law claims from core bankruptcy matters to allow judgments to be entered in state court with enforcement left to the bankruptcy court, (9) the burden on the court's docket, (10) the likelihood that the commencement of the proceeding in a bankruptcy court involves forum shopping by one of the parties, (11) the existence of a right to a jury trial, and (12) the presence in the proceeding of nondebtor parties.

*KeyBank Nat'l Ass'n*, 600 B.R. at 225-26 (quoting *Lothian Cassidy*, 487 B.R. at 165).

Defendants argue that these factors favor the Court's exercise of jurisdiction, but their arguments are based on faulty premises.

First, Defendants argue that this Court should exercise jurisdiction because "[s]hould Plaintiff recover on a claim that properly belongs to Debtor's bankruptcy estate, it would be receiving property that belongs to the estate's creditors," and because should Plaintiff lose, "the Trustee would be at risk of collateral estoppel preventing the pursuit of such claims for the benefit of Debtor's creditors."  Dkt. No. 23 at 16-17.  But that argument rests on the assumption that Plaintiff is pursuing claims as successor to the Debtor that belong to the estate.  That assumption is fallacious.  Indeed, Defendants' argument is further undermined by their representation that they do not intend to seek a transfer of the case to the Eastern District of Virginia, in which the of the Debtor Action is pending.  The same faulty premise also dooms

Defendants' argument that this case is directly related to the bankruptcy case. *Id*. at 22. It is not. It is a simple state law contract case—albeit with the added complication that Defendants are successors to the signatory to the contract, BWW.

Defendants also argue that "[t]he post-disclosure, post-dissolution portions of Plaintiff's case are 'core' proceedings" because they 'affect[] . . . the debtor-creditor . . . relationship' and involve the 'allowance or disallowance of claims against the estate,'" *id*. at 18, but that is also untrue for the reasons previously stated. The claims asserted by Plaintiff arise out of a contractual relationship that it had with BWW, not with Debtor. For similar reasons, Defendants' argument that it will not be feasible to sever unrelated state law claims from core bankruptcy matters, *id*. at 22, also fails. There are no core bankruptcy matters in the removed action.

Defendants further argue that state law issues do not predominate over bankruptcy issues because—Defendants claim—Plaintiff's state law claims "lack any merit." *Id*. at 20. Plaintiff obviously disputes the point. But whichever party is right as to the merit of Plaintiff's claims is irrelevant to whether state law issues predominate. This factor looks to the number and significance of the state claims, and not to their merit. *See, e.g.*, *Rahl v. Bande*, 316 B.R. 127, 135 (S.D.N.Y. 2004). Bankruptcy issues do not predominate simply because Defendants argue that Plaintiff will lose on a complaint asserting exclusively state law claims. Indeed, Defendants' next argument is at cross-purposes with their third argument. They claim that the state law issues are not difficult or unsettled because they may all be dismissed. Dkt. No. 23 at 22.[11] But

---

[11] Defendants cite *Norkin v. DLA Piper Rudnick Gray Cary, LLP*, 2006 WL 839079, at *5 (S.D.N.Y. Mar. 31, 2006), in which state laws "d[id] not predominate" because "[a]lthough plaintiff's causes of action [were] styled as New York State law claims, they turn[ed] largely on issues that [were] intertwined with the bankruptcies." Here, the issue of BWW's liability under the Guaranty and of Defendants' liability as successors to BWW are not before the bankruptcy

the very fact that the state-law issues raised by Plaintiff are hotly disputed by Defendants supports the continued exercise of jurisdiction over those claims by the state court judge who already has years of experience with this case.

Next, Defendant argues that the related state court action—the Lease Action—is stayed due to the Debtor Action. *Id.* That stay may eventually be lifted, however, and, moreover, the fact that the Lease Action is now stayed does not negate the fact that the state court became familiar with the closely related common factual background shared by the Lease Action and this action.

Defendants also argue that the Guarantee Action will not burden the Court's docket. *Id.* at 22-23. They acknowledge that the portion of the Guarantee Action that is not based on the post-dissolution conduct can be summarily adjudicated but argue that there is some other portion of the case that would be subject to the automatic stay. *Id.* But, as already explained, the post-dissolution conduct asserted in the state court action is asserted in support of the claim that Defendants are successors to BWW, not to Debtor. The entirety of the case is ready for summary adjudication. And that summary adjudication can be most efficiently handled by the state court judge who already has been presiding over the state law issues in this case.

Finally, Defendants argue that they are not engaged in forum shopping. It is notable, however, that bankruptcy was commenced—at Defendants' direction, according to Plaintiff— and this motion to remand was filed in the late stages of this action, when plaintiff was "finalizing a renewed motion for summary judgment" against the Defendants to address the narrow issues that remained active. *See* Dkt. No. 19 at 21-22. The circumstances indicate forum shopping. *See In re Nassau Dev. of Vill. W. Corp.*, 547 B.R. 857, 862 (Bankr. S.D. Fla. 2016)

court in the Debtor Action.

("The [] Action is a non-core proceeding with no independent federal jurisdiction, state court issues are only involved, non-debtor defendants are present, and the action almost reached final adjudication in the state trial court. The timing and nature of the removed case strongly suggests forum selection.").

Ultimately, all of the factors favor abstention here. This action involves only settled state law issues, brought exclusively against non-debtor parties, and there is no basis for federal jurisdiction other than Section 1334. There are no bankruptcy law issues, the jurisdictional basis is "non-core," and the only parties to the action are non-debtors. The state law issues, while not unsettled, are intricate and require familiarity with the record—which the state court has, as the action has been litigated for nearly three years. The action originally brought by Plaintiff against BridgeStreet Corporate Housing, *47 E. 34th Street (NY), L.P. v. BridgeStreet Corporate Housing, LLC*, Index No. 653320/2015, which involves similar underlying facts and legal issues to the instant action, has been pending in state court since 2015. The Plaintiffs in this action have requested a jury trial; because the bankruptcy court cannot hold a jury trial, any such trial would need to proceed in a district court that begins with no familiarity either with this action (unlike the state court) or with the debtor action (unlike the bankruptcy court). See *In re Fruit of the Loom, Inc.*, 407 B.R. 593, 601 (Bankr. D. Del. 2009) ("As this [bankruptcy court] cannot conduct a jury trial," the possibility of such a trial "favors abstention").

Finally, although it is conceivable as a legal matter that the indemnification claims will have an effect on the administration of the estate, as a practical matter any effect is likely to be small or negligile. As Plaintiff has persuasively argued, insofar as any judgment in this action creates an indemnification claim by Defendants against the estate in the Debtor Action, it correspondingly decreases value of the claim by Plaintiff against the estate by the same amount;

plaintiff cannot collect a judgment against the Debtor that it has already collected from Defendants. *See* Dkt. No. 19 at 15. Moreover, insofar as Defendants assert an indemnification claim for fees and costs under the 2011 Credit Agreement, *see* Dkt. No. 2-2 at 89, that claim too is likely to have a negligible effect. Debtor filed under Chapter 7 of the Bankruptcy Code for liquidation; this is not a Chapter 11 case in which the Debtor will emerge from bankruptcy. The bankruptcy schedules filed by Debtor—docketed in this action as an exhibit at Dkt. No. 25-8— demonstrate that Debtor's assets which will be liquidated are dwarfed by its liabilities, including liabilities to secured creditors. Debtor possesses $2,152,171.20 of assets, all in real and personal property, against which, at the time the schedules were filed, secured creditors had filed claims totaling $61,692,162.00. Priority unsecured creditors had filed claims totaling $66,586.53.[12] *See id.* at 3. Defendants' argument is based on the notion that their claim for indemnification, should it be allowed, would increase the value of unsecured claims and thereby affect the distribution of assets within the bankruptcy estate. But, based on the schedules, it is unlikely that the distribution of assets will ever reach the unsecured creditors. As the Justice Breyer has summarized:

---

[12] Plaintiff averred at argument that "since [the] schedules were filed, other parties have filed proofs of claim, as is common in a bankruptcy, and that has increased the priority claims pool to be over $100,000. And, in addition to that, Plaintiff filed a $13.1 million secured claim based on a judgment that's also senior to the $27 million in unsecured claims." Tr. At 15.

In Chapter 7, a trustee liquidates the debtor's assets and distributes them to creditors.

. . .

The Code also sets forth a basic system of priority, which ordinarily determines the order in which the bankruptcy court will distribute assets of the estate. Secured creditors are highest on the priority list, for they must receive the proceeds of the collateral that secures their debts. Special classes of creditors, such as those who hold certain claims for taxes or wages, come next in a listed order. Then come low-priority creditors, including general unsecured creditors. The Code places equity holders at the bottom of the priority list. They receive nothing until all previously listed creditors have been paid in full.

The Code makes clear that distributions of assets in a Chapter 7 liquidation must follow this prescribed order.

. . .

In Chapter 7 liquidations, priority is an absolute command—lower priority creditors cannot receive anything until higher priority creditors have been paid in full.

*Czyzewski v. Jevic Holding Corp.*, 137 S. Ct. 973, 978-979, 983 (2017) (internal citations to provisions of the Bankruptcy Code omitted). Thus, assuming the secured claims are valid, only if there were assets to be distributed in excess of $60 million would the layer of unsecured creditors—within which Defendants' indemnification claim would reside—even be reached. This conclusion is not altered by the stipulation entered into between the bankruptcy trustee and Domus Funding, acting as agent for certain secured lenders, and presented to the Bankruptcy Court for its approval on May 5, 2021, on the eve of oral argument in this case. That stipulation—which at the time of argument had yet to be approved by the Bankruptcy Court—recognized that Defendants alleged that they had a proof of claim against Debtor in the amount of $79,949,463.44, for debt which such lenders maintain is "secured by perfected, first-priority liens on substantially all of Debtor's assets." Dkt. No. 27-1 at 8. It provided that if Defendants pursued that claim, the proceeds would be split: fifty percent of the net proceeds of any

recoveries obtained would be disbursed to the agent, and fifty percent would be disbursed to the bankruptcy estate "pursuant to the priorities set forth under the Bankruptcy Code." *Id.* at 11-12. It thus is entirely speculative that any recovery contemplated by the stipulation will be achieved, let alone that proceeds from such recovery would eventually flow to Defendants in satisfaction of their claim for indemnification.

Defendants argue that this action might pose a risk to the bankruptcy estate because Plaintiff might choose in the future to asset a claim as successor to Debtor. That argument is both inapposite to the applicable standard—which addresses claims that are now pending, not hypothetical claims—and is answered by the fact that if and when the Trustee in the Debtor Action determines that this action poses any risk to the bankruptcy estate, it can seek a remedy from the bankruptcy court, including an automatic stay or a turnover, pursuant to 11 U.S.C. § 362 and 11 U.S.C. § 542, respectively.[13] The Court must determine whether federal jurisdiction lies based on what Plaintiff has pleaded today. Based on that pleading, there is no federal

---

[13] 11 U.S.C. § 362 governs the automatic stay effected by commencement of a bankruptcy proceeding, and provides that a bankruptcy filing "operates as a stay" of, *inter alia*, "(1) the commencement or continuation . . . of a judicial, administrative, or other action or proceeding against the debtor . . . to recover a claim or other action or proceeding against the debtor that arose before the commencement of the case under this title . . . [and] (3) any act to obtain possession of property of the estate or of property from the estate or to exercise control over property of the estate." 11 U.S.C. § 542 provides for the turnover of property belonging to the estate. *See* 5 Collier on Bankruptcy ¶ 542.01 (16th ed. 2021) ("A turnover action 'invokes the court's most basic equitable powers to gather and manage property of the estate.'") (quoting *Braunstein v. McCabe*, 571 F.3d 108, 122 (1st Cir. 2009)). The Court need not and does not take any position on whether such an action by the Trustee would succeed, and indeed the balance of the applicable factors favor abstention regardless. The Court notes, however, that the case Defendant adverted to at oral argument to rebut the argument that a motion to stay or a turnover action were still available to the trustee, *In re Ivani*, 308 B.R. 132, 133 (Bankr. E.D.N.Y. 2004), is inapposite to whether such relief is available. That case concerned the application of the *Rooker-Feldman* doctrine to prevent a bankruptcy court from adjudicating the applicability of the automatic stay where a New York state court already ruled on that issue. *See id.* at 137.

jurisdiction, and the Court abstains from exercising jurisdiction "related to" jurisdiction based on Defendants' indemnification claims.

## CONCLUSION

For the foregoing reasons, although the Court determines that it has "related to" jurisdiction pursuant to Section 1334(b), it abstains from exercising that jurisdiction. The motion to remand is GRANTED. The Clerk of Court is respectfully directed to terminate all motions and deadlines, to close the case, and to transfer the case back to the Supreme Court of the State of New York, County of New York.

SO ORDERED.

Dated: May 20, 2021
     New York, New York          _____
                                        LEWIS J. LIMAN
                              United States District Judge